UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10375-RWZ |
| | ) | |
| MICHAEL PRIDGEN | ) | |
| | ) | |

DEFENDANT MICHAEL PRIDGEN'S MOTION TO SUPPLEMENT
POST-HEARING MEMORANDUM IN SUPPORT OF DEFENDANT'S
MOTION TO SUPPRESS STATEMENTS

Now comes the Defendant, Michael Pridgen, and hereby moves this Honorable Court to

allow him to supplement his post-hearing memorandum in support of Defendant's Motion to

Suppress Statements which was electronically filed on February 14, 2006 with the following

documents:

1. Boston Police Department Prisoner Booking Form dated October 29, 2004 (Exhibit

A);

2. Government's Opposition to Defendant's Motions to Suppress Statements (Exhibit B);

3. Boston Police incident report dated October 29, 2004 (Exhibit C); and

4. Memorandum and Order in the matter of United States of America v. Jill E. Doucette

dated May 31, 2005 (Exhibit D).

As grounds for this motion, Defendant states that an error occurred during scanning the

exhibits appended to the Post-Hearing Memorandum In Support of Defendant's Motion to

Suppress Statements filed through ECF on February 14, 2006 and the exhibits filed with the

memorandum were unreadable.

1

Wherefore, Defendant prays that this Honorable Court allow his Motion to Supplement

Post-Hearing Memorandum in Support of Defendant's Motion to Suppress Statements.

Respectfully submitted
MICHAEL PRIDGEN
By his attorney,
/s/ Page Kelly
Page Kelley
   B.B.O. #548237
Federal Defender Office
408 Atlantic Avenue, 3rd Floor
Boston, MA  02110
Tel: 617-223-8061

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 15, 2006.

 /s/ Page Kelley
Page Kelley

# Exhibit A



# Boston Police Department

## Prisoner Booking Form

Report Date: 10/29/2004 12:06
Booking Status: Unverified
Printed By: Linskey, Mike

Booking Name: PRIDGEN
First: Michael
Middle: Eton                          Suffix: Jr
Home Address: 934 Parker ST #447, JAMAICA PLAIN MA 02130 US

Sex: Male
Race: Black Non-Hispanic
Date of Birth: 05/09/1984




District: 02
Booking Number: 04-03383-02
Incident Number: 040586965

Arrest Date: 10/29/2004 11:30
Booking Date: 10/29/2004 11:46

Charges:  Unlawful Possession of Firearm (269-10 (h))
Unlawful Possession of Ammunition (269-10H)
Firearm Discharged Within 500 ft. of Dwelling (269-12E)

---

## Miranda Warning

Before asking you any questions, it is my duty to advise you of your rights:

1) You have the right to remain silent;

2) If you choose to speak, anything you say may be used against you in a court of law or other proceeding;

3) You have the right to consult with a lawyer before answering any questions and you may have him present with you during questioning;

4) If you cannot afford a lawyer and you want one, a lawyer will be provided for you by the State without cost to you;

5) You may also waive the right to counsel and your right to remain silent and you may answer any question or make any statement you wish. If you decide to answer any questions you may stop any time to consult with a lawyer.

**Do you understand what I have told you?**

Yes, I understand

X _Michael Pridgen_
Signature of Prisoner

**Informed Rights By Officer:**
BPD   10141   Linskey, Mike

_M. Linskey_
Signature of Officer

---

## Prisoner Property

Money: 5.00        Property Storage No: 1
Property: cell phone, 1 gold colored bracelet, laces, belt, keys

Telephone Used: Yes
Breathalyzer Used: No
Examined at Hospital: No
Examined by EMS: No
Visible Injuries:
none

Acknowledgement of property items being held

X _Michael Pridgen_

# Exhibit B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

)
UNITED STATES OF AMERICA         )
                                 )
          v.                     )    CR. NO. 04-10375-RWZ
                                 )
MICHAEL PRIDGEN                  )
                                 )

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S
## MOTIONS TO SUPPRESS STATEMENTS

### Introduction

The government submits it opposition to Defendant's Motion
to Suppress Statements, referred to here as the "Motion." By the
Motion, the defendant seeks to suppress statements he made to the
police before, during and afer his arrest. For the reasons set
forth below, the Motion should be denied.

### Facts[1]

The defendant's motion rests on a version of events that are
essentially incorrect. On October 29, 2004 at approximately
10:55 a.m., Boston Police officers Michael Ross and Juan Seoane
were on the second floor of the Roxbury District Court when they
heard what they believed were gun shots outside of the
courthouse. The officers looked outside and saw several people
running toward the courthouse. The officers also observed Boston
Police Officer Albert Rue running toward Warren Street and
attempting to transmit on his radio.

Officers Ross and Seoane ran outside to investigate and

---

[1]The government expects that the following evidence would be
adduced at an evidentiary hearing.

witnesses directed them toward the intersection of Warren Street and Dudley Street. When the officers arrived at that intersection, a Boston tow truck driver and a civilian indicated that the suspect had run toward Warren Place.

A witness at Warren Place told Officer Ross that the suspect ran around to the back of a newly constructed home at 8 Warren Place. At the same time, nearby construction workers working on top of a roof told officer Ross that the suspect went toward the rear yard of 8 Warren Place. One of the workers subsequently told the police that the suspect was holding a silver colored handgun.

As Officer Ross proceeded down the driveway at that address, a man later identified as the defendant was walking towards him from the back yard, dressed in a white shirt, blue jeans, and white sneakers. Officer Ross detained the defendant without incident and brought him to the front of the house. No one struck the defendant at any time. After other Officers arrived, Officer Ross went to the back yard, which was enclosed by a chain link fence, and confirmed that there were no other individuals in the area.

Officer Ross also observed what appeared to be fresh foot prints in the dirt leading from the driveway to the rear fence. On the other side of the fence, Officer Ross saw a rolled up black sweatshirt. Underneath the sweatshirt, Officers found a

silver colored, Smith and Wesson, 357 Model 65 revolver, bearing

serial number 7D12564. The gun was loaded with 4 live rounds, 3

rounds of .357 caliber ammunition and 1 round of 38 caliber

ammunition. Two spent rounds were also found in the gun,

indicating it had been fired at least twice.

Two witnesses who had seen the suspect run behind 8 Warren

Place subsequently told the police that the defendant was in fact

the person they had seen run behind the house. One of the

witnesses stated that the defendant, now in a white shirt, had in

fact been wearing a black sweatshirt when he first ran behind the

house.

Based on these events, the defendant was placed under

arrest, notwithstanding his claim that he had merely run to the

back of the house after hearing gun shots, and then decided to

use the construction workers' toilet there. Subsequently, at the

station, and after being advised of his Miranda rights, but not

in response to any interrogation, the defendant offered that he

had just gotten off the bus and was going to the store, but then

decided to use the toilet.

### Argument

**THE DEFENDANT WAS NOT SUBJECTED TO CUSTODIAL INTERROGATION
IN VIOLATION OF HIS MIRANDA RIGHTS.**

### Legal Framework

In <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the Supreme

Court held that "certain warnings must be given before a
suspect's statement made during custodial interrogation could be
admitted in evidence." see also Dickerson v. United States, 530
U.S. 428 (2001). As is common knowledge, the Miranda warnings
include the right to remain silent and the right to an attorney.
Officers are required to respect a suspect's request for a lawyer
and not initiate further interrogation. Oregon v. Bradshaw, 462
U.S. 1039, 1042-44 (1983). However, before the Miranda rights
attach, there must be custodial interrogation. As a general
rule, interrogation has been defined for this purpose as express
questioning or its functional equivalent, which includes "any
words or actions on the part of the police (other than those
normally attendant to arrest and custody) that the police should
know are reasonably likely to elicit an incriminating response
from the suspect."    Pennsylvania v. Muniz, 496 U.S. 582, 600-01
(1990) (quoting Rhode Island v. Innis, 446 U.S. 291 (1980)).

Analysis

In light of the foregoing, the defendant's claim fails
easily. As an initial matter, the defendant does not seriously
contest that there was probable cause to arrest the defendant
based on all the evidence. The claim that the police thereafter
elicited statements from the defendant in violation of his rights
under Miranda also fails because the statements at issue did not
arise during custodial interrogation. As an initial matter, no

4

one forced the defendant to the ground and repeatedly struck him,
or struck him at all, and the backdrop that he seeks to create as
context for the few benign statements he did make, one of a
violent, hostile and coercive environment, simply never existed.
Moreover, the statements the defendant did make, by their very
nature, show themselves to be nothing more than unsolicited
statements made by an arrestee trying to distance himself from
incriminating evidence rather than statements made in response to
formal questions.  In short, the statements at issue were not
obtained in violation of Miranda.

### Conclusion

Because there was probable cause to arrest the defendant,
and because the defendant's statements were unsolicited and not
the product of custodial interrogation, the motion to suppress
should be denied.

> Respectfully submitted,
> MICHAEL J. SULLIVAN
> United States Attorney

> BY:   /s/Donald L. Cabell
> Donald L. Cabell
> Assistant U.S. Attorney
> One Courthouse Way, Suite 9200
> Boston, MA 02210
> (617) 748-3105

# Exhibit C

# BOSTON POLICE
## INCIDENT REPORT

ORIGINAL ☒     SUPPLEMENTARY ☐

| KEY SITUATIONS OTHERS | | | COMPLAINT NO. 010586965 | | REPORT DIST. B2 | CLEARANCE DIST |
|---|---|---|---|---|---|---|
| TYPE OF INCIDENT FIREARM, CARRYING | CRIME CODE 0 | | STATUS | | DATE OF OCCUR A 10/29/04 | B |
| LOCATION OF INCIDENT 85 WARREN ST | | APT | DISPATCH TIME 10.59 AM | | TIME OF OCCUR A 10.55 AM | B |
| VICTIM-COMP. (LAST, FIRST, MI) COMM. OF MASS | PHONE (000)-000-0000 | | SEX | RACE | | MARITAL STATUS |
| ADDRESS | | APT | OCCUPATION | | AGE 0 | D.O.B |

| PERSON REPORTING P.O. JUAN J. SEOANE | ADDRESS 135 DUDLEY ST,ROXBURY,MA,02119-0000 | | APT | PHONE (617)-343-4268 |
|---|---|---|---|---|
| PERSON REPORTING P.O. MICHAEL M. ROSS | ADDRESS 135 DUDLEY ST,ROXBURY,MA,02119-0000 | | APT | PHONE (617)-343-4268 |
| PERSON REPORTING P.O. ALBERT C. RUE | ADDRESS 1165 BLUE HILL AVE ,ROXBURY,MA,02119-0000 | | APT | PHONE (617)-343-4717 |

WAS THERE A WITNESS TO THE CRIME?  ☒ YES ☐ NO  A

| PERSON INTERVIEWED | AGE | LOCATION OF INTERVIEW | APT | HOME ADDRESS | APT | TELEPHONE | |
|---|---|---|---|---|---|---|---|
| LT. SEXTON, SGT. GALLAGHER | 0 | | | 135 DUDLEY ST,ROXBURY,MA,02119-0000 | | (617)-343-4268 | RES |
| | | | | | | (000)-000-0000 | BUS |
| SGT. GROSS/LT. HOPKINS | 0 | | | 135 DUDLEY ST,ROXBURY,MA,02119-0000 | | (617)-343-4270 | RES |
| | | | | | | (000)-000-0000 | BUS |
| P.O. QUINN/P.O. SHAW/P.O. GERALDO | 0 | | | 135 DUDLEY ST,ROXBURY,MA,02119-0000 | | (617)-343-4270 | RES |
| | | | | | | (000)-000-0000 | BUS |
| P.O. PIREZ/P.O. MURPHY/P.O. GILBERT | 0 | | | 135 DUDLEY ST,ROXBURY,MA,02119-0000 | | (617)-343-4270 | RES |
| | | | | | | | BUS |
| P.O. LEWIS/P.O. RIDGE/P.O. TOLLAND | 0 | | | 135 DUDLEY ST,ROXBURY,MA,02119-0000 | | (617)-343-4270 | RES |
| | | | | | | | BUS |
| P.O. DEPINA/CALDORON-POLLARD | 0 | | | 135 DUDLEY ST,ROXBURY,MA,02119-0000 | | (617)-343-4270 | RES |
| | | | | | | (000)-000-0000 | BUS |
| P.O. DOYLE/P.O. BLISS/P.O. CRAIGER | 0 | | | 135 DUDLEY ST,ROXBURY,MA,02119-0000 | | (617)-343-4268 | RES |
| | | | | | | (000)-000-0000 | BUS |
| DET. MACDONALD/DET. PISHKIN/DET. LEE | 0 | | | 135 DUDLEY ST,ROXBURY,MA,02119-0000 | | (617)-343-4275 | RES |
| | | | | | | (000)-000-0000 | BUS |

NUMBER OF PERPETRATORS  2 — CAN SUSPECT BE IDENTIFIED AT THIS TIME  ☒ YES ☐ NO  B

| | STATUS ARRESTED | | NAME (LAST, FIRST, MI) PRIDGEN,MICHAEL ETON | | S.S. NO 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 | BOOKING NO 20040338302 | PHOTO NO | ALIAS |
|---|---|---|---|---|---|---|---|---|
| P E R S O N S | WARRANT NO | ADDRESS 934 PARKER ST,JAMAICA PLAIN,MA,02130-0000 | | SEX MALE | RACE BLACK NON-HISPANIC | | AGE 20 | HEIGHT 5-08 | DOB 5/9/1984 |
| | SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) WHITE T-SHIRT/BLUE JEANS/WHITE SNEAKERS(BLACK SWEATER FOUND WITH GUN) | | | WEIGHT 150 | BUILD MEDIUM | HAIR DARK BROWN | | EYES BROWN |

| | STATUS N/A | | NAME (LAST, FIRST, MI) PERRY,ANTHONY | | S.S. NO 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 | BOOKING NO 000000000 | PHOTO NO | ALIAS PIERCE,TONY |
|---|---|---|---|---|---|---|---|---|
| P E R S O N S | WARRANT NO | ADDRESS 27 ELDER ST,DORCHESTER,MA,00000-0000 | | SEX MALE | RACE BLACK NON-HISPANIC | | AGE 18 | HEIGHT 6-03 | DOB 3/9/1986 |
| | SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) BLUE SHIRT, BLUE JEANS, BLACK SNEAKERS | | | WEIGHT 200 | BUILD MEDIUM | HAIR BLACK | | EYES BROWN |

CAN SUSPECT VEHICLE BE DESCRIBED  ☐ YES ☒ NO

| V E H I C L E S | STATUS | | REG. STATE | REG. NO | PLATE TYPE | | YEAR(EXP) | MODEL |
|---|---|---|---|---|---|---|---|---|
| | VEHICLE MAKE YEAR | | VEHICLE NO | | STYLE | | COLOR(TOP/BOTTOM) | |
| | OPERATOR'S NAME | | | LICENSE NO | STATE | OPERATOR'S ADDRESS | | |
| | OWNER'S NAME | | | | OWNER'S ADDRESS | | | |

CAN PROPERTY BE IDENTIFIED  ☒ YES ☐ NO

| | STATUS | TYPE OF PROPERTY | SERIAL OR IDENTING/GUARD NO | | BRAND NAME-DESCRIPTION | MODEL | GAUGE | TOP |
|---|---|---|---|---|---|---|---|---|
| P R O P E R T Y | SEIZED | FIREARMS | 7D12564 | | SMITH & WESSON - SILVER REVOLVER | 357 MODEL 65 | | |
| | SEIZED | AMMUNITION | | | LIVE AMMUNITION | | | |
| | SEIZED | AMMUNITION | | | 5 357 ROUNDS/.38 × 4 LIVE ROUNDS | | | |
| | SEIZED | AMMUNITION | | | 357 ROUNDS - 1 SPENT ROUNDS | | | |

IS THERE A SEARCH WARRANT

| | TYPE OF NEAR/TOOL/OR PRE. OR/GUARD NO | | | TIME OF BREAK NO | PLACE OF ENTRY |
|---|---|---|---|---|---|

| | GUN | | COMMERCIAL & RESIDENTIAL | | N/A | | N/A | | ☑ ☐ |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | YES NO |
| M O | WEATHER | LIGHTING | | TRANSPORTATION OF SUSPECT | | VICTIM'S ACTIVITY | | | |
| | CLEAR | NATURAL | | FOOT | | N/A | | | |
| | UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR | | | | | RELATIONSHIP TO VICTIM | | | |
| | SEE NARRATIVE | | | | | N/A | | | |

| IS THERE ANY PHYSICAL EVIDENCE (DESCRIPTION AND DISPOSITION IN NARRATIVE) | ☑ ☐ |
|---|---|
| | YES NO |

| IS THERE ANY OTHER REASON FOR INVESTIGATION (REASON BELOW) | ☑ ☐ |
|---|---|
| | YES NO |

| BLOCK NO. | NARRATIVE AND ADDITIONAL INFORMATION | ☑ ☐ |
|---|---|---|
| | | YES NO |

ON OCTOBER 29, 2004 AT APPROXIMATELY 10 55AM OFFICERS ROSS AND SEOANE WHERE STANDING ON THE SECOND FLOOR OF ROXBURY DISTRICT COURT HOUSE WHEN WE HEARD THE SOUNDS OF WHAT APPEARED TO BE TWO GUN SHOTS. OFFICERS LOOKED OUT THE COURT HOUSE YARD AND OBSERVED SEVERAL PEOPLE RUNNING TOWARDS THE COURT HOUSE FROM THE YARD AND OFFICER ALBERT RUE RUNNING TOWARDS WARREN ST TRYING TO TRANSMIT ON HIS RADIO. OFFICERS ROSS AND SEOANE RAN OUTSIDE AND WERE POINTED BY WITNESSES TOWARDS THE DIRECTION OF WARREN STREET AND DUDLEY STREET. UPON ARRIVING TO THIS LOCATION A BOSTON TRANSPORTATION TOW TRUCK DRIVER AND ANOTHER CIVILIAN DRIVER DIRECTED OFFICERS ROSS, SEOANE AND GERALDO TOWARDS THE DIRECTION OF WARREN PLACE. OFFICER GERALDO CONTINUED ONTO DUDLEY STREET TO CREATE A PERIMETER. OFFICERS SEOANE AND ROSS CONTINUED ON WARREN PLACE. A FEMALE WEARING A BROWN JACKET (LATER IDENTIFIED BY DET. COOPER AS MARTHA HOLLEY) TOLD OFFICER ROSS THAT THE SUSPECT JUST RAN BEHIND THE NEW CONSTRUCTION HOUSE, 8 WARREN PLACE, ON THAT STREET. WHILE OFFICERS WERE RUNNING ON WARREN PLACE CONSTRUCTION WORKERS ON TOP OF THE ROOF OF THE OLD NYNEX BUILDING WERE YELLING TO OFFICERS THAT HE RAN BEHIND THE NEW HOUSE. MS. HOLLEY POINTED THE HOUSE AND TOLD OFFICER ROSS THAT THE SUSPECT WENT TO THE SIDE OF THE HOUSE TOWARD THE BACKYARD OF 8 WARREN PLACE. OFFICER ROSS IMMEDIATELY OBSERVED THE FRONT DOOR FOR 8 WARREN PLACE PARTIALLY AJAR AND CONTINUED TO THE REAR OF 8 WARREN PLACE THROUGH THE FENCE IN THE DRIVEWAY. FIVE FEET AFTER OFFICER ROSS TURNED THE FRONT OF THE HOUSE INTO THE DRIVEWAY HE OBSERVED A BLACK MALE, LATER IDENTIFIED AS MICHAEL PRIDGEN, WITH CORNROWS, WHITE T-SHIRT, BLUE JEANS, WHITE SNEAKERS WALKING TOWARDS THE STREET FROM THE BACKYARD. OFFICER ROSS IMMEDIATELY GRABBED THE SUSPECT AND WITH THE ASSISTANCE OF OFFICER SEOANE PLACED THE SUSPECT ON THE GROUND WITH HANDS BEHIND HIS BACK. OFFICER PIREZ ARRIVED AND GAVE OFFICER ROSS HIS HANDCUFFED TO SECURE THE SUSPECT. OFFICER SEOANE WENT TO THE REAR OF THE YARD AND CLEAR BACK YARD AND CONSTRUCTION TOILET IN REAR OF THE HOUSE. AFTER OTHER RESPONDING DISTRICT OFFICERS ARRIVED A PERIMETER OF 8 WARREN PLACE WAS ESTABLISHED AND A K-9 UNIT WAS REQUESTED. OFFICER ROSS SET UP IN THE REAR OF 8 WARREN PLACE BY THE CONSTRUCTION TOILET. OFFICER ROSS OBSERVED FRESH FOOT PRINT ON THE DIRT AND REQUESTED FROM OFFICER PIREZ TO FIND OUT WHAT KIND OF SHOES PRIDGEN WAS WEARING. OFFICER PIREZ TOLD OFFICER ROSS THAT PRIDGEN WAS WEARING SNEAKERS. OFFICER ROSS FOLLOWED THE FOOT PRINT ON THE GROUND TOWARDS THE REAR FENCE. THE FOOT PRINTS STOPPED AT THE FENCE AND AS HE LOOKED ON THE OTHER SIDE OF THE FENCE OFFICER ROSS OBSERVED A BLACK SWEAT SHIRT ROLLED UP ON THE GROUND DIRECTLY BEHIND THE CONSTRUCTION TOILET IN THE ADJACENT YARD SGT. DET. GALLAGHER ARRIVED TO THE SCENE AND TOOK OVER THE CRIME SCENE SETTING UP A PERIMETER IN THE COURT HOUSE YARD AND MARKING THE EVIDENCE FOUND IN THE ADJACENT YARD OF 8 WARREN PLACE. DET. MACDONALD FOUND THE BASEMENT DOOR FOR 8 WARREN PLACE PARTIALLY OPEN. MR. PRIDGEN WAS PLACED BY P.O. LEWIS IN THE BD41 CRUISER AND WAS TRANSPORTED TO DISTRICT B-2 FOR BOOKING BY OFFICER GILBERT. MS. HOLLEY TOLD OFFICER SEOANE THAT PRIDGEN WAS THE MALE THAT RAN TO THE REAR OF 8 WARREN PLACE AFTER SHE HEARD THE SOUNDS OF SHOTS FIRE, BUT THAT HE WAS WEARING A BLACK SWEAT SHIRT. A PERIMETER OF 8 WARREN PLACE WAS KEPT UNDER THE DIRECTION OF LT. SEXTON/SGT. GROSS/ AND SGT. DET. GALLAGHER OF THIS LOCATION WAITING FOR THE ARRIVAL OF THE T529 (P.O. WILLIS). P.O. WILLIS AND HIS K-9 CONDUCTED A SEARCH OF 8 WARREN PLACE. BUT NO SUSPECTS WERE FOUND. LT. HOPKINS RESPONDED TO THE SCENE AND WAS BRIEFED BY LT. SEXTON AND SGT. DET. GALLAGHER OF THE INCIDENT. AFTER MARKING AND PHOTOGRAPHING THE EVIDENCE DISCOVERED BY OFFICER ROSS. SGT. DET. GALLAGHER REMOVED THE BLACK SWEATSHIRT AND DISCOVERED A SMITH & WESSON .357 SILVER REVOLVER MODEL 65. SERIAL NUMBER 7D12564. SGT. DET. GALLAGHER SECURED THE FIREARM AND REQUESTED THE BALLISTIC UNIT TO RESPOND TO THE SCENE. THE V883 (WASHINGTON) RESPONDED AND RECOVERED THE BALLISTIC EVIDENCE FROM SGT. DET. GALLAGHER. FURTHER EXAMINATION OF THE REVOLVER BY THE V883 REVEALED THAT THIS REVOLVER CONTAINED 6 ROUNDS. TWO OF THESE ROUNDS WERE SPENT AND THE OTHER REMAINING ROUNDS IN THE CYLINDER WERE 3 .357 LIVE ROUNDS OF AMMUNITION AND 1 .38 LIVE ROUND OF AMMUNITION. THE V883 SECURED THE BALLISTIC EVIDENCE FOR FURTHER TESTING AND SAFEKEEPING. FURTHER EXAMINATION OF THE ORIGINAL SCENE, NEAR THE BOSTON PUBLIC LIBRARY AND THE ROXBURY COURT YARD BY DETECTIVES. UNDER THE DIRECTION OF SGT. DET. GALLAGHER AND SGT. GROSS FOUND TWO MARKS ONE ON THE LIBRARY GLASS WALL AND ANOTHER ON A FENCE POST NEAR THE CORNER OF THE LIBRARY THAT ARE CONSISTENT WITH BULLET MARKS. I.D. UNIT VD50 (HARRIS) RESPONDED TO THE SCENE AND PHOTOGRAPHED WERE TAKING OF THIS MARKINGS. DURING BOOKING OFFICER ROSS DISCOVERED THAT PRIDGEN HAD A RIPPED ON HIS RIGHT REAR PANTS THAT IS CONSISTENT WITH A RIP FROM GETTING YOUR PANTS HOOKED ON A CHAIN LINK FENCE. DURING HIS ARREST MR. PRIDGEN MADE STATEMENTS TO OFFICER SEOANE. HE STATED THAT HE JUST WENT TO THE REAR OF 8 WARREN PLACE TO USE THE TOILET. HE ALSO, SAID THAT HE RAN BACK TO THE HOUSE AFTER HE HEARD THE SHOTS AND WHILE IN THE BACK DECIDED TO USE THE CONSTRUCTION TOILET. HE ALSO SAID THAT HE WAS SURE THAT THERE WAS NO BODY IN THE HOUSE, BECAUSE HE DIDN'T SEE ANYONE ELSE WHILE HE WAS IN THE REAR OF THE HOUSE. DURING BOOKING PRIDGEN TOLD OFFICER ROSS THAT HE HAD JUST GOTTEN OFF THE BUS AND WAS GOING TO THE STORE, BUT THEN HE DECIDED TO USE THE TOILET. DET. COOPER INTERVIEW THE FOLLOWING WITNESSES MARTHA HOLLEY, STEVEN GILCHRIST, AND SCOTT ALDEN. MS. HOLLEY AND GILCHRIST WERE STANDING BY A TRUCK ON WARREN PLACE WHEN THEY HEARD TWO SHOTS THEY THEN SAW A BLACK MALE WEARING BLACK SWEATSHIRT BLUE JEANS RAN FROM WARREN STREET ONTO WARREN PLACE WITH HIS HANDS IN HIS SWEATER AND THEN RUN TO THE REAR OF 8 WARREN PLACE. THEY THEN SAW THE SAME PERSON THAT RAN TO THE REAR OF 8 WARREN PLACE AFTER HE BEING DETAINED BY OFFICERS WEARING ONLY A WHITE T SHIRT AND BLUE JEANS. SCOTT ALDEN TOLD DET COOPER THAT HE WAS ON THE ROOF WORKING AND HE HEARD THREE SHOTS TWO LOUD SHOT AND WHAT APPEARS TO BE A DIFFERENT CALIBER SHOT ONCE HE LOOKED OVER TO WARREN STREET HE OBSERVED A BLACK MALE WEARING A LONG BLACK T-SHIRT OR

LONG BLACK SWEATSHIRT RUNNING FROM THE COURT YARD TOWARDS HIS BUILDING (THE OLD NYNEX BUILDING LOCATED AT THE CORNER OF WARREN ST. AND WARREN PLACE) HOLDING A LARGE SILVER HANDGUN ON HIS RIGHT HAND. ONCE HE GOT TO THE BUILDING HE RAN TOWARDS WARREN PLACE WHERE HE LOST SIGHT OF HIM. APPROXIMATELY AT THE SAME TIME THE MBTA POLICE ARRESTED ANTHONY PERRY, DOB 03/09/86 FOR ASSAULT AND BATTERY AND DISTURBING THE PEACE IN THE DUDLEY BUS STATION. FURTHER INQUIRY OF THIS ALTERCATION BY THE MBTA OFFICERS REVEALED THAT MR. PERRY COULD BE THE VICTIM OF THE SHOOTING IN THE COURT YARD. SGT. DET. GALLAGHER ORDERED DET. MACDONALD TO GO TO THE MBTA POLICE STATION AND INTERVIEW MR. PERRY. MR. PERRY TOLD DET. MACDONALD THAT HE EXITED ROXBURY COURT (A BOARD OF PROBATION CHECK OF MR. PERRY REVEALED THAT HE HAD A COURT DATE FOR A PENDING CASE OF LARCENY FROM THE PERSON, POSSESSION OF CLASS B WITH THE INTENT TO DISTRIBUTE AND NUMEROUS OTHER CHARGES, DOCKETS 0402CR002376A AND 0402CR001373A-F) WHEN HE WAS ENCOUNTERED BY A GROUP OF 10 TO 11 BLACK MALES IN THE COURT YARD. THEY TOLD HIM TO WALK WITH HIM AND HE TOLD THEM NO. HE THEN HEARD 3 GUN SHOTS. HE THEN CHASED TWO OF THE 10 TO 11 BLACK MALES THAT APPROACHED HIM IN THE COURT HOUSE INTO THE DUDLEY BUS STATION. AT THE BUS STATION HE STARTED FIGHTING WITH ONE OF THE SUSPECTS AND WHEN THE MBTA POLICE ARRIVED EVERYONE STARTED RUNNING AND THEN THE MBTA POLICE ARRESTED HIM. HE CLAIMS THAT HE DOESN'T KNOW ANY OF THE MALE THAT ASSAULTED HIM. FURTHER INVESTIGATION BY SGT. DET. GALLAGHER AND POLICE OFFICER RUE REVEALED THAT THIS ALTERCATION STEMS FROM A POSSIBLE DISPUTE BETWEEN THE BROMLEY HEATH GANG AND EGLESTON SQUARE GANG. POLAROID PHOTOGRAPHS TAKEN OF THE EVIDENCE AND RIPPED PANTS OF MR. PRIDGEN (4) ARE HELD AS EVIDENCE. BLACK SWEATER RECOVERED AT SCENE WAS SEND TO EVIDENCE MANAGEMENT. THE YOUTH VIOLENCE STRIKE FORCE WAS NOTIFIED OF POSSIBLE DISPUTE BY THESE TWO GROUPS. THE VD50 TOOK PHOTOGRAPHS OF THE SCENE AND THE FIREARM. DET. COOPER, DET. COTTER, DET. MACDONALD WILL WRITE MORE DETAILED FORMS 26 OF THEIR INTERVIEWS AND WITNESS INFORMATION. ASSISTANTS DISTRICT ATTORNEY'S MARTIN (ROXBURY) AND HALL (SUPERIOR) WERE NOTIFIED OF THE INCIDENT.

| UNIT ASSIGNED | TOUR OF DUTY | REPORTING OFFICER'S NAME | REPORTING OFFICER'S ID | PARTNER'S ID | FI |
|---|---|---|---|---|---|
| V858 | 2 | JUAN J SEOANE | 11458 | 11358 | NO |
| DATE OF REPORT | SPECIAL UNITS NOTIFIED(REPORTING) | | | | TELETYPE NO |
| 10/29/04 | BALLISTIC'S UNIT IDENTIFICATION UNIT CRIME LABORATORY YVSF | | | | |
| TIME COMPLETED | PATROL SUPERVISOR NAME | PAT. SUP ID | DUTY SUP. NAME | | DUTY. SUP ID |
| 02:40 PM | | | ROBERT R SHEETS | | 11460 |

# Exhibit D

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 04-10135-GAO

UNITED STATES OF AMERICA,
Plaintiff

v.

JILL E. DOUCETTE,
Defendant.

MEMORANDUM AND ORDER
May 31, 2005

O'TOOLE, D.J.

The defendant has moved to suppress statements made by her to a special agent of the Drug Enforcement Administration (DEA) on the ground that she had not been advised by the agent of her so-called "Miranda rights." An evidentiary hearing was conducted in which the agent in question and another agent testified. Having considered the evidence adduced, I find as follows:

After an investigation that included surveillance and controlled purchases of illegal drugs, Doucette and her boyfriend, co-defendant Thomas Scola, were arrested on April 7, 2004, in Wakefield, Massachusetts. They were brought to a building that was serving as a temporary location for the Wakefield police. Doucette was held in a room that was essentially a holding or waiting area, and Scola was held in an adjoining room. Special Agent Clem Fisher, who was at the location but who had not participated in the arrests, was asked to watch over Doucette while she was in custody.

Doucette was somewhat agitated. I do not find that she was "high" or under the influence of drugs to the extent that her understanding was impaired. She was expressing concern about what might happen to her child as a consequence of her arrest. She also expressed anger at Scola. Agent Fisher asked her if she wanted to give a statement, and she said she did. At this point, Fisher testified, he took a standard DEA Miranda card from his credentials wallet and read the usual warnings to Doucette. He also testified that she indicated that she understood and was willing to answer questions.[1] Thereafter, she provided information both in answer to particular questions and in a rapid stream of unprompted discourse, which she now seeks to suppress.

Although Fisher testified that he called in another agent, Dan Genese, who was present at the makeshift police station but in another area, to witness his reading of the warnings, and Genese testified, consistently with Fisher, that he was called in to witness Fisher's reading of the warnings, there is no objective evidence corroborating their testimony. On the contrary, the objective evidence, while not flatly inconsistent with the agents' testimony, does raise questions about it.

Both agents wrote reports on form DEA-6 that set forth information about the interrogations of Scola and Doucette. In his report, Agent Genese noted simply that Doucette had been interviewed by Agent Fisher. He made no notation about his having witnessed Agent Fisher give the Miranda warnings to Doucette. In the very next paragraph of his report, however, Genese did explicitly report that he had given Scola the Miranda warnings before questioning him and that Special Agent DiTullio had witnessed that event. In other words, in one instance he specifically recorded the giving and

---

[1]  Fisher testified that "she indicated yes, she understood these rights" and "basically, she said yes." These summary assertions do not help one to decide where to locate her expression of understanding on a hypothetical spectrum extending from shrugging acquiescence at one end to unmistakable articulation on the other.

witnessing of the Miranda warnings and in the other instance he did not. Agent Fisher's report, which is five pages long and sets forth the information supplied by Doucette in detail, also contains no mention of the giving or witnessing of Miranda warnings. Fisher acknowledged that an agent would ordinarily include in his report the fact that the warnings had been given, so as to make a contemporaneous record of that significant occurrence. The omission to do so might signal a mere clerical error or it might support an inference that the event had not occurred, because if it had, it would have been recorded.

Nor is there any written acknowledgment signed by Doucette attesting that she had been given the Miranda warnings and waived the presence of an attorney, as sometimes happens. Agent Fisher testified that he took notes on paper as Doucette talked, so it seems apparent that it was possible for him to have Doucette indicate in writing an acknowledgment and waiver of her rights. Both agents testified, however, that it was not DEA policy to have interrogated subjects give such a written acknowledgment.

In sum, there is no objective, contemporaneous evidence that the warnings were given and waived. The only evidence that supports a factual finding that the warnings were given is the agents' oral testimony, well after the events in question, that they were. The government's suggested reconciliation of the apparent inconsistency is that Agent Fisher gave the rights, but simply erred in failing to record the fact in his report. The defendant, in contrast, suggests in effect that the error was in the not giving of the warnings in the first place, and that explains why the report omits to say that they were given.

The government bears the burden of persuasion. On the evidence, I cannot say that I am persuaded that the error lay in failing to record, rather than in failing to read the rights in the first

3

place. Thus unpersuaded, I do not find that the Miranda rights were read to Doucette before she gave her statements, incontestably made in the course of custodial interrogation. I therefore conclude that the evidence is subject to the exclusionary rule. See Dickerson v. United States, 530 U.S. 428 (2000).

The motion to suppress is GRANTED, and the statements made by Doucette to Agent Fisher may not be offered in evidence by the government.


May 31, 2005                              \s\ George A. O'Toole, Jr.
DATE                                      DISTRICT JUDGE


4