UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-CR-10375-RWZ |
| | ) | |
| MICHAEL PRIDGEN | ) | |
| | ) | |

SENTENCING MEMORANDUM OF MICHAEL PRIDGEN

The defendant, Michael Pridgen, through counsel, Page Kelley, files this motion for a departure from the advisory sentencing guidelines, pursuant to 18 U.S.C. §3553(a) and the Supreme Court's decision in *United States v. Booker* and *United States v. Fanfan*, 125 S. Ct. 738 (2005).

I.     **Procedural History**

On October 29, 2004, Michael Pridgen was arrested by Boston Police officers for the present case. He was in state custody until December 6, 2004, when he was released to the custody of the United States Marshals. He was indicted on December 15, 2004 for Felon in Possession of Firearm and Ammunition, in violation of 18 U.S.C. §922(g)(1).

He was found guilty after a jury trial which ended on July 26, 2006.

II.     **Argument for Booker Variance based on 18 U.S.C. §3553 considerations.**[1]

---

[1] The sentencing factors which *Booker/Fanfan* require district courts to consider include:
(1) the nature and circumstances of the offense and the history and characteristics of the defendant [§ 3553(a)(1)];
(2) the need for the sentence imposed to
    (A) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner [§ 3553 (a) (2)];

**A. The Nature and Circumstances of the Offense (§ 3553(a)(1)).**

The government states in its statement of offense conduct that Mr. Pridgen fired a gun and then ran away. The only witness who testified to seeing anyone fire a weapon at the time of the incident was Maria Souza, a probation officer in the Roxbury District Court, who testified that she saw the shooter and described that person as having the same physical characteristics and clothing as Mr. Pridgen did when he was arrested.[2] However, on three previous occasions, Ms. Souza gave a completely different description of the shooter. Right after the shooting Ms. Souza had told a Boston Police Detective that the shooter was wearing a grey sweatshirt and grey pants, not a black shirt and blue jeans, as she testified. On two other occasions Ms. Souza told a defense investigator, Alicia Hutton, that the shooter had on a grey sweatsuit. She also described the shooter as much taller than Mr. Pridgen.

No other witness saw the shooting.

Thus, even if the jury found Mr. Pridgen guilty of possessing the firearm, the government did not prove that he was the person who fired the gun. Under the facts presented to the jury, it is just as likely that the shooter, wearing grey, handed the gun to Mr. Pridgen after the shooting, as it is that Mr. Pridgen was the shooter.

---

(3) the kinds of sentences available [§ 3553 (a) (3)];
(4) the guidelines and policy statements issued by the Sentencing Commission, including the (now non-mandatory) guideline range [§ 3553 (a) (4) & (a) (5)];
(5) the need to avoid unwarranted sentencing disparity among defendants with similar records that have been found guilty of similar conduct [§ 3553 (a) (6)]; and
(6) the need to provide restitution to victims of the offense [§ 3553 (a) (7)].

[2]It is notable that she did not identify Mr. Pridgen at trial as the shooter.

The government states in its statement of offense conduct that "Mr. Pridgen was part of a group of young men who had a dispute with Anthony Perry." The government presented no evidence of motive or any reason why Mr. Pridgen would have been shooting at anyone, much less at Mr. Perry. Counsel has seen nothing in discovery or any other source that establishes that Mr. Perry was the intended victim of the shooting.

The government states in the statement of offense conduct that "the defendant pulled out a silver firearm and fired two shots." For some reason, probation edited this to read that Mr. Pridgen "fired two shots toward a person in the crowd." No ballistics evidence was found in the vicinity of the courthouse, even though the police conducted a thorough search. It is just as likely that a gun was fired into the air as it is that it was aimed at any person.

**B. The History and Characteristics of the Defendant (§ 3553(a)(1)).**

Michael Pridgen is twenty-two years old. He has seldom seen his father. He grew up in the Bromley Heath Projects in Boston, a notoriously dangerous and crime-ridden neighborhood. His mother was never married; her three children had different fathers. She often worked two jobs at once and struggled to support herself and her children.

Beginning in about 1997, when Mr. Pridgen was about thirteen years old, his mother began having seizures. She would fall to the floor, convulse, and would be unresponsive for long periods of time. She would have trouble breathing after the episodes. Mr. Pridgen witnessed these episodes when he was home alone with his mother and would call 911 for help. His mother was the only person in his family he was close to. The episodes frightened him and made him worry for his mother's health. He often thought that she would die from her "epilepsy," or from her "asthma." In fact, he later learned that the seizures were the result of a slow-growing,

inoperable brain tumor, that became progressively worse until eventually it led to his mother's death in November, 2003.

Mr. Pridgen's mother worked very long hours when he was a child. By the time he was nine years old, his siblings had left home and he was at home by himself with his mother. The Bromley Heath Project was not a good place for a young boy to be by himself. In 1995, when he was eleven, Mr. Pridgen's cousin had his throat slit by some other youths. Around that same time, a friend of his, seventeen years old, was shot to death. Soon after that, another of his cousins was murdered.

Mr. Pridgen's trouble with the law began when he was sixteen, in 2000, when he was arrested for shoplifting. He was committed to DYS for this offense, a very serious disposition for a shoplifting charge.

Records from the Department of Youth Services indicate that his mother, Ms. Holmes, reported to a caseworker that he was "a sweet and attentive child who sometimes help[ed] out with household chores" but that he sometimes spent the night with friends in the Orchard Park projects against her wishes. She confirmed that he "express[ed] a lot of concern and [was] overall very caring" when she had seizures. She said that he pretended that it did not matter "that his father [was] not in his life, but she [knew] that it bother[ed] him a lot." She also reported that in addition to his feelings of loss about his father, her mother had died within the last year, and Mr. Pridgen was very close to her. She also reported that the deaths of his cousins and friends about five years prior had greatly affected him. Ms. Holmes told the caseworker that she hoped that if he were committed to the Department of Youth Services, he would find

direction. It seemed that because of her long work hours she was not able to supervise him as much as she wanted to.

In fact, Mr. Pridgen did not "find direction" at the Department of Youth Services. From November, 2000 to May of 2002, when he "aged out" of DYS, he was sent to various "placements," and periodically released to his mother, without making any real progress toward educational goals or job security. Although during this time he held a succession of short-term jobs, such as a maintenance worker at Pine Manor College, he was unable to find and maintain stable employment.

In July, 2001, Mr. Pridgen's daughter, Shaki Ayana Hall Pridgen, was born. Her mother was his girlfriend, Shawntay Hall. Ms. Hall says that when Mr. Pridgen was not in custody he was "with her all the time," and that he was a very attentive and patient father. Shaki developed a strong attachment to him and Ms. Hall says that now every day Shaki "cries for him" and asks her where he is. Ms. Hall said that he provided her with financial support and help with babysitting when he could.

In September, 2002, Mr. Pridgen was diagnosed as having ameloblastoma, a condition in which non-malignant tumors grow in an out of control fashion. He had a large tumor removed from his jaw in September, 2003, a painful procedure in which a segment of his jaw was removed and replaced with a metal plate. Afterward, his jaw was wired shut for months.

In November 2003, Mr. Pridgen's mother died from a brain tumor. He was nineteen years old. He came to the house and discovered her body on the living room floor. After his mother's death, Mr. Pridgen became extremely depressed. He experienced recurrent dreams of

finding her body. He felt that he could have helped her had he been at home. He couldn't sleep and found it difficult to talk to anyone about what had happened.

This is Mr. Pridgen's first adult incarceration. Although he has been incarcerated for over two years, he has not received any disciplinary reports at the Plymouth County Correctional Facility, where he has been housed.

**C. The Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense and to Afford Adequate Deterrence to Criminal Conduct, and to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner (§ 3553 (a) (2)).**

The guideline range in this case, 97 to 120 months, is higher than necessary to accomplish the goals of sentencing as set forth in §3553(a).[3] A lower sentence would still accomplish the goals of reflecting the seriousness of the offense, promoting respect for the law, and deterring criminal conduct. Although the crime Mr. Pridgen was convicted of is serious, there was no actual victim in this case. Taking into account Mr. Pridgen's personal circumstances, where in the course of a few years he experienced the death of his grandmother, a close friend, and two cousins, and then the death of his mother, Mr. Pridgen's inability at the time of the incident to maintain a stable job and focus on his future is understandable.

This is Mr. Pridgen's first adult incarceration. He was twenty years old at the time of this offense. A sentence that is too long would have a negative influence on his ability to reform himself and successfully reintegrate into society. A sentence below the advisory guidelines,

---

[3] It is notable that the actual guideline range, 97-121 months, is higher than the statutory maximum for the crime, an indication of how inflated the range is in this case.

followed by a long period of supervised release, would provide "correctional treatment in the most effective manner" as set out in the statute.

## II.     Conclusion

For the reasons set out above, Mr. Pridgen asks the Court to reduce his sentence in light of the factors set out in 18 U.S.C. §3553(a).

MICHAEL PRIDGEN<br>
By his attorney,<br>
 /s/ Page Kelley<br>
Page Kelley<br>
  B.B.O. #548237<br>
Federal Defender Office<br>
408 Atlantic Avenue, 3rd Floor<br>
Boston, MA  02110<br>
Tel: 617-223-8061

Date: October 13, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on October 13, 2006.

 /s/ Page Kelley
Page Kelley