# United States Court of Appeals
## For the First Circuit

---

No. 06-2595

UNITED STATES OF AMERICA,

Appellee,

v.

MICHAEL PRIDGEN,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

---

Before

Boudin, Chief Judge,
Selya, Senior Circuit Judge,
and Gelpí,˙ District Judge.

---

Christopher R. Goddu, Assistant Federal Public Defender, with whom Page Kelley, Assistant Federal Public Defender, and Federal Defender Office were on brief, for appellant.
James F. Lang, Assistant United States Attorney, with whom Donald L. Cabell, Assistant United States Attorney, and Michael J. Sullivan, United States Attorney, were on brief, for appellee.

---

February 29, 2008

---

˙ Of the District of Puerto Rico, sitting by designation.

**GELPÍ**, **District Judge**.   Michael Pridgen appeals his conviction in the district court for being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). He argues that the trial judge committed reversible error upon refusing to allow him to introduce extrinsic evidence of a government witness's prior inconsistent statements.   For the reasons discussed below, we conclude that the trial court erred, but that the error was harmless.

I.      **Factual Overview**

We summarize here the relevant facts evidenced in the trial record.

On the morning of October 29, 2004, someone fired shots outside of the Roxbury District Courthouse in Dudley Square, Roxbury, Massachusetts. On the day of the shooting, Maria Sousa, a probation officer in the courthouse, was meeting with a client in her office. Shortly before 11:00 a.m., she heard a gunshot outside her window.  Sousa looked out her window and saw several people including two men standing together.  They stood approximately twenty to twenty-five feet away from her office window.  She had a clear view of the men and observed one of the them holding a silver revolver in his right hand.  The man holding the revolver was approximately five feet eight inches in height, weighed approximately 140 to 150 pounds, had cornrow braids in his hair and a medium complexion, and wore a black sweatshirt, jeans, and

-2-

sneakers.  The other man was two or three inches taller and of
medium build and complexion.  He wore jeans, sneakers, and a light
gray sweatshirt.

Sousa saw the man holding the revolver fire it in the
direction of the front of the courthouse.  She then saw him run
towards Warren Place.  She saw the other man run but could not see
in which direction.

Martha Holley, a construction landscaper, was working
across the street from the courthouse at the corner of Warren Place
and Warren Street when the shooting occurred.  Holley heard two to
four loud bangs that sounded like gunshots come from the direction
of the courthouse.  She looked towards the courthouse and saw
people running in all directions.  She observed one man looking
back at the commotion while crossing the street near her.  The
young man was dressed in a dark sweatshirt, light blue jeans, and
sneakers.  He wore cornrow braids in his hair, had light skin, and
appeared to be "twenty-ish."  Holley watched him run, with his
hands in his sweatshirt pouch, down Warren Place and then up a
driveway at 8 Warren Place.

At around the same time, Scott Alden was working on the
roof of the Urban League Building near the same intersection where
Holley saw the man.  Alden also heard gunshots.  When he heard the
shots, he looked in the direction of the courthouse and saw an
African-American male wearing jeans and a dark-colored hooded

sweatshirt run past. The man held a silver firearm in his right hand. Alden lost sight of the man when he ran under the overhang of the building on which he was working.

Boston Police Department ("BPD") Officers Michael Ross and Juan Seoane were in the courthouse the day of the shooting. Both officers exited the courthouse when they heard two shots. Outside the building, the officers observed twenty to thirty people running or laying on the ground.

Holley and Alden pointed the officers in the direction of Warren Place. Holley directed the officers to the first house on the street, 8 Warren Place, saying, "He just went behind the new construction house, right there." Three other individuals, a tow truck driver, a taxi driver, and a criminal defense attorney, also directed the officers toward Warren Place. When Officer Seoane arrived at Warren Place, construction workers on a nearby roof indicated to him that a man had run behind the new construction site at 8 Warren Place. Officer Seoane arrived at 8 Warren Place approximately thirty seconds to one minute after he exited the courthouse; Officer Ross arrived approximately twenty to thirty seconds after he exited the courthouse.

An approximately six-foot-high chain link fence with an opening surrounded the front of the house at 8 Warren Place. Officer Ross, who arrived first at the house, entered through the opening. He then noticed that the front door to the house was ajar

-4-

and a gate to the backyard was open. He peered around an opening in the fence and saw Pridgen walking toward him up the driveway from the rear of the house. Officer Ross observed that Pridgen had cornrow braids in his hair and was wearing jeans and sneakers. He also observed that Pridgen was wearing a white tee-shirt, which struck him as odd given that it was a cold October day. Pridgen raised one hand and backed up a few steps when he saw Officer Ross. Officers Ross and Seoane then detained Pridgen.

After detaining Pridgen, the officers searched the immediate area. The search revealed no evidence of another person in the vicinity. Officer Ross then went down the driveway to the backyard where he noticed a set of footprints leading to and from an approximately three-foot-high fence at the rear of the yard. He compared the footprints to the soles of Pridgen's sneakers; they appeared to be consistent. Officer Ross then looked over the fence and saw a rolled-up black sweatshirt about five to ten feet away from the fence. There was no debris on top of the sweatshirt. BPD Detective Greg Gallagher recovered the sweatshirt. He discovered wrapped inside of it a silver Smith & Wesson .357 caliber revolver. The firearm contained four live rounds and two spent shells, indicating that the firearm had been fired twice. Detective Gallagher found only partial prints, insufficient to make an identification, on the firearm and one round of ammunition.

On December 15, 2004, a federal grand jury in the District of Massachusetts returned an indictment charging Pridgen with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). Trial commenced on July 24, 2006. The government called Sousa as its first witness. During her direct examination, Sousa provided details regarding the two men she saw outside her window on October 29th. She testified that the shooter was approximately five feet eight inches in height, weighed approximately 140 to 150 pounds, had cornrow braids in his hair and a medium complexion, and wore a black sweatshirt, jeans, and sneakers. She also testified that the man next to the shooter was two or three inches taller, had a medium build and complexion, and wore jeans, sneakers, and a light gray sweatshirt.

On cross examination, Pridgen's counsel questioned Sousa about allegedly conflicting descriptions she had previously given. Counsel asked Sousa about two meetings with defense investigator Alicia Hutton during which she allegedly stated that the shooter was taller and wore a gray sweatshirt. Sousa responded that she did not recall making the statements.

During re-direct, Sousa testified that she made notes of the October 29th events two days after the events occurred. She explained why she made the notes. She stated that she "wanted to write something so that [she] could look back when the case came to court." Familiar with the courts, she knew that cases sometimes

-6-

take years to get to court. Sousa testified that she did not review the notes before either meeting with Hutton but reviewed them before trial.

Defense counsel later tried to impeach Sousa via extrinsic evidence of prior inconsistent statements.[1] Pridgen called Hutton to testify that Sousa had previously told her that the shooter was the taller man wearing a gray sweatshirt. The district court, however, excluded the evidence, stating "That's not how you get a prior inconsistent statement into evidence" and "it doesn't fit within the rules."

During her opening statement, defense counsel told the jury and the court about inconsistencies they would hear in Sousa's statements. The judge, however, excluded the evidence defense counsel planned to introduce to demonstrate the inconsistencies. Notwithstanding the exclusion, defense counsel, in her closing argument, suggested to the jury that Sousa had made inconsistent statements and perhaps had fabricated her trial testimony.

---

[1] Pridgen sought to admit the hearsay evidence under Rule 613(b) of the Federal Rules of Evidence, which permits admission of extrinsic evidence of a prior inconsistent statement to impeach a witness's credibility. Sousa's prior inconsistent statements would not have been admissible as substantive evidence. Compare United States v. Winchenbach, 197 F.3d 548, 558 (1st Cir. 1999) (noting Rule 613(b) evidence admissible to call into question declarant's credibility, not to demonstrate truth of either statement), with Fed. R. Evid. 801(d)(1) (delineating circumstances in which witness's prior statement constitutes nonhearsay admissible for substantive purposes).

At trial, Pridgen presented an innocent bystander defense. He argued that he was innocently walking down the driveway of 8 Warren Place when Officers Ross and Seoane came upon him. He also argued that the shooter escaped police by using an alternate exit from the backyard at 8 Warren Place. The jury rejected his defense and returned a guilty verdict on July 26, 2006. The judge sentenced him to eighty-four months, below the guidelines range.

The instant appeal followed. Pridgen's sole claim before us is that the exclusion of extrinsic evidence regarding Sousa's alleged prior inconsistent statements violated his Sixth Amendment confrontation rights and constitutes reversible error.

## II.  **Analysis**

Pridgen contends that Rule 613(b) of the Federal Rules of Evidence permitted the admission, for impeachment purposes, of extrinsic evidence of Sousa's alleged prior inconsistent statements. He further argues that the district court violated his Sixth Amendment confrontation rights in excluding the impeachment evidence and that the error was not harmless beyond a reasonable doubt. The government concedes that the impeachment evidence was admissible but notes that, upon the district court's exclusionary ruling, Pridgen failed to identify which evidentiary rule called for admission of the evidence. Pridgen's failure, the government argues, precludes this court from finding that the district court

-8-

abused its discretion in excluding the evidence.  Alternatively, the government contends that the challenged exclusion was harmless.

We agree with Pridgen that Hutton's testimony was admissible to impeach Sousa.  It is not clear from the record why the district court excluded Hutton's impeachment testimony.  Rule 613(b) permits admission of extrinsic evidence of a witness's prior inconsistent statement in limited circumstances; extrinsic evidence is only admissible when a foundation has been laid for its admission.  This  required foundation includes giving the witness an opportunity to explain or deny the out of court statement.  Fed. R. Evid. 613(b); see also United States v. Hudson, 970 F.2d 948, 955  (1st  Cir.  1992)  (discussing  Rule  613(b)  foundation requirements).  A review of the record reveals that Pridgen laid a proper foundation, which included giving Sousa the opportunity to explain or deny her statements, for admission of the extrinsic evidence.  We therefore conclude that the district court erred in not allowing Sousa to be impeached.  We now must determine if the error was harmless.

The parties dispute whether the court should apply the constitutional or non-constitutional formulation of the harmless error test.  The government advocates for the non-constitutional, or evidentiary, harmless error test.  Under the non-constitutional harmless error test, a conviction must be upheld if it is highly probable that the error did not affect the verdict.  United States

v. Roberson, 459 F.3d 39, 49 (1st Cir. 2006), cert. denied, 127 S.
Ct. 1261 (2007). Conversely, Pridgen urges the court to apply the
constitutional formulation of the harmless error test.    The
constitutional test requires the government to demonstrate that the
error was harmless beyond a reasonable doubt by showing that the
defendant would have been convicted in the absence of the error.
Hudson, 970 F.2d at 953.

Today, we need not decide which harmless error test
applies.   Under either the constitutional or non-constitutional
standard, the exclusion of the impeachment evidence was harmless.[2]
Pridgen would have been convicted, in light of the compelling
evidence of guilt the government offered, even if the district
court had admitted Hutton's impeachment testimony.

The government presented an exceedingly strong case of
guilt based on eyewitness testimony and circumstantial evidence
regardless of Sousa's testimony regarding who fired the shots.
Sousa was not the only eyewitness who offered testimony of the
event and a physical description of the man who ran toward Warren
Place following the shooting.    Holley and Alden also offered
detailed and largely consistent descriptions of the scene and the

_____

[2]We note that Pridgen failed to raise his constitutional
argument during trial and could be held to have lost this claim.
See United States v. Vigneau, 187 F.3d 82, 86 (1st Cir. 1999); see
also United States v. Lombard, 72 F.3d 170, 187 (1st Cir. 1995)
(noting harmless beyond a reasonable doubt standard applies to
properly preserved constitutional error).

-10-

suspect.[3]  Holley testified that, immediately after the shooting,
she saw a man wearing cornrow braids in his hair and dressed in a
dark sweatshirt, blue jeans, and sneakers run down Warren Place and
up the driveway at 8 Warren Place.  Alden, who had a different
vantage point than Holley, testified that he observed an African-
American male dressed in a dark hooded sweatshirt and jeans.  Alden
testified that the man had a silver revolver in his right hand.
Pridgen's physical appearance just moments after the shooting
matched the witness's description, absent the sweatshirt.    The
sweatshirt police recovered matched the description of the one worn
by the runner.  The firearm wrapped in the sweatshirt matched the
description of the firearm Alden observed in the runner's hand.
Pridgen offered no plausible reason to doubt either Alden's or
Holley's testimony.  Cf. United States v. de Jesus-Rios, 990 F.2d
672, 679 n.10 (1st Cir. 1993) (noting jury had reason to doubt
credibility of only witness who provided admissible testimony
linking defendant to crime).

          The  government  also  offered  strong  circumstantial
evidence of Pridgen's guilt.  The evidence presented at trial
demonstrated that five people, including Holley and Alden,
indicated to police that a man had run from the courthouse toward
Warren Place immediately after the shooting.  Moments after the

---

[3]Holley and Alden's descriptions of the runner generally
comport with Sousa's trial testimony regarding the shooter who ran
toward Warren Place.

shooting, police discovered Pridgen in close proximity to the silver firearm found at 8 Warren Place. Despite the day's cold weather, Pridgen was wearing only a tee-shirt, jeans, and sneakers. Police found no other individual in the immediate vicinity of where they found the bundled black sweatshirt and the firearm. Officer Ross observed a set of footprints, which appeared to match Pridgen's footwear, leading to and from the fence behind which where they found the firearm. Given the wealth of circumstantial evidence and eyewitness testimony linking Pridgen to the crime, we conclude that Pridgen would have been convicted in the absence of the district court's erroneous exclusion of the impeachment evidence. The district court's error, therefore, was harmess.

Pridgen's argument that the district court committed reversible error relies heavily upon de Jesus-Rios. This case, however, is readily distinguishable from de Jesus-Rios. In de Jesus-Rios, the court, calling it a "close call," held that the district court's erroneous admission of a pretrial identification constituted reversible error where the government presented little remaining evidence to link the defendant to the crime, and where the court had no way to determine the role the identification played in the jury's verdict. De Jesus-Rios, 990 F.2d at 678-79. The court also noted that the record revealed a basis for genuine concern regarding the only remaining witness's credibility on a key question. Id. at 679 n.10. In this case, the government's

-12-

circumstantial evidence and eye witness testimony was extremely more compelling than the admissible evidence the government presented in de Jesus-Rios. Cf. id. at 679 (acknowledging only admissible evidence linking defendant to crime consisted of one witness's identification testimony). Additionally, unlike in de Jesus-Rios, Pridgen offered no viable challenge to the remaining witness's, particularly Alden's and Holley's, credibility. Cf. id. at 679 n.10 (highlighting remaining witness's lack of credibility on central issue). These distinctions limit the applicability of de Jesus-Rios to this case.

Pridgen offers one final argument to demonstrate the purported harmfulness of the district court's error. He draws our attention to his trial counsel's promise, made to the jury during her opening statement, to present Hutton's testimony to challenge Sousa's credibility. In light of this promise, Pridgen argues, the erroneous exclusion was so prejudicial that it could not constitute harmless error. See Anderson v. Butler, 858 F.2d 16, 17 (1st Cir. 1988) ("[L]ittle is more damaging than to fail to produce important evidence that had been promised in an opening."). The overwhelming evidence of Pridgen's guilt, however, limited the importance of Hutton's testimony and rebuts Pridgen's argument. The result would have been the same even if the court had admitted the impeachment evidence. Additionally, we note that Pridgen's counsel presented

her closing argument as if the district court had admitted the impeachment evidence.

In sum, any error by the district court was harmless, given the government's strong evidence of Pridgen's guilt.

**III.     Conclusion**

For the reasons explained above, we affirm Pridgen's conviction.

**Affirmed**.